# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

**BOBBY BARRINGER,**

       **Plaintiff,**

                                                 **Civil Action 2:11-cv-534**
    **v.**                                   **Judge Michael H. Watson**
                                          **Magistrate Judge Elizabeth P. Deavers**

**MICHAEL J. ASTRUE,**
**COMMISSIONER OF SOCIAL SECURITY,**

       **Defendant.**

## REPORT AND RECOMMENDATION

Plaintiff, Bobby Barringer, brings this action under 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of a final decision of the Commissioner of Social Security ("Commissioner") finding a closed period of disability from February 12, 2007, through March 31, 2009. This matter is before the United State Magistrate Judge for a Report and Recommendation on Plaintiff's Statement of Errors (ECF No. 11), the Commissioner's Memorandum in Opposition (ECF No. 14), Plaintiff's Reply (ECF No. 15), and the administrative record (ECF No. 10). For the reasons that follow, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's Statement of Errors and **AFFIRM** the Commissioner's decision finding a closed period of disability.

## I. BACKGROUND

Plaintiff protectively filed his applications for benefits on February 28, 2007, alleging that he has been disabled since February 12, 2007, at age 45. Plaintiff alleges disability as a result of diabetes, hip and back problems, and a learning disability. (R. at 168.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative law Judge Rossana L. D'Alessio ("ALJ") held a video hearing on November 5, 2009, at which Plaintiff, represented by counsel, appeared and testified. (R. at 47-62.) A vocational expert appeared but did not testify. (*Id*.) On January 22, 2010, the ALJ issued a decision finding that Plaintiff was "disabled" within the meaning of the Social Security Act for a closed period from February 12, 2007, through March 31, 2009; and was no longer disabled as of April 1, 2009 due to medical improvement. (R. at 17-33.) The ALJ's decision became final and appealable in April 2011, when the Appeals Council denied Plaintiff's request for review. (R. at 1-4.) Plaintiff then timely commenced the instant action.

## II. PLAINTIFF'S TESTIMONY

Plaintiff testified at the administrative hearing that he was six-foot-one and weighed 265 pounds, having gained sixty-five pounds due to his back issues. (R. at 47.) He resided in a trailer with his wife and child-year-old child. (R. at 48.) He smoked a pack a cigarettes a day. (R at 59.) Prior to his back problems, Plaintiff said he worked on cars and performed farm work. (R. at 59.)

According to Plaintiff, his back pain and fluctuating sugar levels prevented him from working. (R. at 50-51.) He also noted pain in his right leg and foot, with the foot pain occurring

## I. BACKGROUND

Plaintiff protectively filed his applications for benefits on February 28, 2007, alleging that he has been disabled since February 12, 2007, at age 45. Plaintiff alleges disability as a result of diabetes, hip and back problems, and a learning disability. (R. at 168.) Plaintiff's applications were denied initially and upon reconsideration. Plaintiff sought a *de novo* hearing before an administrative law judge.

Administrative law Judge Rossana L. D'Alessio ("ALJ") held a video hearing on November 5, 2009, at which Plaintiff, represented by counsel, appeared and testified. (R. at 47-62.) A vocational expert appeared but did not testify. (*Id*.) On January 22, 2010, the ALJ issued a decision finding that Plaintiff was "disabled" within the meaning of the Social Security Act for a closed period from February 12, 2007, through March 31, 2009; and was no longer disabled as of April 1, 2009 due to medical improvement. (R. at 17-33.) The ALJ's decision became final and appealable in April 2011, when the Appeals Council denied Plaintiff's request for review. (R. at 1-4.) Plaintiff then timely commenced the instant action.

## II. PLAINTIFF'S TESTIMONY

Plaintiff testified at the administrative hearing that he was six-foot-one and weighed 265 pounds, having gained sixty-five pounds due to his back issues. (R. at 47.) He resided in a trailer with his wife and child-year-old child. (R. at 48.) He smoked a pack a cigarettes a day. (R at 59.) Prior to his back problems, Plaintiff said he worked on cars and performed farm work. (R. at 59.)

According to Plaintiff, his back pain and fluctuating sugar levels prevented him from working. (R. at 50-51.) He also noted pain in his right leg and foot, with the foot pain occurring

once or twice per day.  (R. at 51.)  (*Id*.)  He represented that he experienced pain every day.  (*Id*.)

Plaintiff estimated that he could stand about 15-20 minutes before he would have to lay down.

(R. at 52.)  He testified to difficulty walking and estimated he could walk about 100-200 yards.

He indicated that pain disrupted his sleep.  (R. at 57.)  He acknowledged that the last time he

sought medical treatment for his back was in August 2008, approximately one year and three

months prior to the hearing.  (R. at 45.)  He further indicated that he had a medical card.  (R. at

50.)

Plaintiff testified that he had been wearing an insulin pump for about a year prior to the

hearing.  (R. at 60.)  He reported that before the pump, his blood sugar levels were 600-700 and

after the pump, they dropped to 200-300.  (*Id*.)  Plaintiff also testified to having a mastectomy on

his pectoral muscle due to infections.  (R. at 61.)  He represented that his mastectomy caused

him to experience pain in his right arm and chest area.  (*Id*.)

As to his daily activities, Plaintiff testified that he did "very little" housework and

watched television.  (R. at 56.)  Plaintiff indicated that he had a driver's license but did not drive

very often.  (R at 49.)

### III.   MEDICAL RECORDS[1]

#### A.   Dr. Jeffrey Braham

In February 2006, Plaintiff's primary care physician, Dr. Jeffrey Braham, ordered an x-

ray and MRI of Plaintiff's lumbar spine due to low back pain.  The lumbar spine x-ray revealed

transitional last lumbar vertebra with sacralization on the right side and pseudoarthrosis

---

[1]Plaintiff does not challenge the Commissioner's findings with respect to his alleged mental impairments.  Accordingly, the Court will focus its review of the medical evidence on Plaintiff's alleged exertional impairments.

formation, evidence of degenerative disc disease at the last two disc interspaces where there was thinning of the disc space, degenerative changes of the endplates of the facets and bridging osteophytes along the right side of the next to the last disc interspace. There was no evidence of acute fracture or destructive lesion. (R. at 253-54.) A hip x-ray taken that same day was normal. (R. at 253.) The lumbar spine MRI revealed prominent disc degenerative changes at L4-5 and L5-Sl and evidence of a prior hemilaminetomy on the right at L5 but no nerve root compression or significant central canal stenosis. (R. at 250-51.)

**B.**     **Jay Shubrook, D.O./University Medical Associates Diabetes/Endocrine Center**

Dr. Shubrook treated Plaintiff for diabetes mellitus from August 2004 through at least August 2009. (R. at 353-413, 757-80.) In August 2004, when Dr. Shubrook first evaluated Plaintiff, he noted that Plaintiff had a seven-year history of diabetes. (R. at 388.)

On October 17, 2006, Plaintiff was hospitalized with blood sugar levels running in the 500s. Plaintiff also reported a right breast infection that was getting progressively worse. Diagnoses on discharge included noninsulin dependent diabetes mellitus, out of control; cellulitis, right breast; and smoker. (R. at 241-44, 270-303.)

On October 30, 2006, Dr. Shubrook noted that Plaintiff's Hgb A1C[2] was 12.7 percent. He switched Plaintiff's medications. (R. at 369-72.) On November 20, 2006, Dr. Shubrook increased Plaintiff's insulin medication dosages and added another medication to control

---

[2]HbA1c is a blood test that shows the average amount of sugar in an individual's blood over a 3 month period. It shows how well an individual is controlling his or her diabetes. Specifically, the A1C test measures what percentage of hemoglobin—a protein in red blood cells that carries oxygen—is coated with sugar (glycated). The higher the A1C level, the poorer blood sugar control. Levels above seven percent reflects that an individual's diabetes control may not be as good as it should be. *See*, www.nih.gov and www.mayoclinic.com.

diabetes. (R. at 366-68.) By December 11, 2006, Plaintiff's Hgb A1C was 9.8 percent; his blood pressure was elevated at 136/81. Dr. Shubrook increased Plaintiff's insulin medication dosage again. (R. at 362-65.) On February 22, 2007, Dr. Shubrook noted that Plaintiff's Hgb Al C was 9.6 percent, and, on March 12, 2007, he noted that Plaintiff was not any closer to his goal than before given that Plaintiff's Hgb A1C was 9.8 percent. He further noted that Plaintiff was at real risk for complications with his current glucose levels. (R. at 358-61.) On March 28, 2007, Dr. Shubrook indicated that Plaintiff's high glucose levels needed to be stabilized before he underwent back surgery. Plaintiff was admitted and placed on an insulin drip. (R. at 353-56.)

In March 2008, Plaintiff complained of difficultly managing his blood sugar levels and indicated that he was interested in an insulin pump. (R. at 757-76.)

In December 2008, after Plaintiff was using an insulin pump, Dr. Shubrook reported that Plaintiff was "doing ok" and that "[o]verall he is much better than last year." (R. at 773.) In April 2009, Dr. Shubrook reported that Plaintiff was "doing well overall," and his "pump is a lifesaver." (R. at 770.) He also noted that Plaintiff thought that he was doing better, too. (*Id*.)

## C. O'Bleness Memorial Hospital

Plaintiff presented to the hospital in April 2008 for uncontrolled hyperglycemia. (R. at 539-51.) It was noted that he had been struggling for the past eighteen months with uncontrolled hyperglycemia and that his numbers had always been extremely high. (R. at 539.) The hospital records also reflect that he had been on numerous medications and various insulin regimens "with no luck." (*Id*.) Plaintiff also complained of chest pain which he rated as a six out of ten and stated the pain was a sharp pain that lasted two to three minutes and occurred several times per day. He indicated that his pain was localized to his left chest area. Pushing on the area did

not reproduce the pain. Plaintiff denied muscle problems, weakness, and sensory problems. His physical examination was essentially normal. Plaintiff was started on an IV insulin drip, and he received diabetes education. (R. at 541.)

**D.      Mountain View Bone & Joint Clinic**

Plaintiff reported to Steven Miller, M.D. at Mountain View Bone & Joint Clinic in January 2007 with complaints of severe right hip pain. Dr. Miller's examination revealed pain with active range of motion and mild swelling. Dr. Miller prescribed an anti-inflamatory medication, Naproxen, physical therapy, and an injection. (R. at 350-52.) In March 2007, Plaintiff rated his pain level as an 8/10 on an analog pain scale. He reported that he had tried Naproxen with no change and an injection with mild improvement for a few days as well as physical therapy with mild improvement. (R. at 347-49.)

**E.      James E. Fleming, Jr., M.D.**

In March 2007, Plaintiff reported to Dr. Fleming, an orthopedist, complaining of low back pain with radiating pain in his right lower extremity that he had endured since his reported laminectomy and discectomy surgery in 1998. (R. at 447-83.) Plaintiff represented that he utilized a walker to ambulate. On physical examination, Dr. Fleming found that Plaintiff was in good general physical health and condition. (R. at 448.) He reported that Plaintiff's gait was normal and that he could heel-and-toe walk without difficulty. Plaintiff demonstrated no problem with balance or station. His cervical and lumbar ranges of motion were full and painless in all planes. Likewise, his forward flexion and extension caused no significant pain. Dr. Fleming noted that Plaintiff experienced no tenderness to palpation over his thoracic, cervical, or lumbosacral spine. On neurologic examination, Plaintiff's reflexes were equal and

symmetric at two in the bilateral biceps, triceps, and brachioradialis; and were equal and symmetric at two in the bilateral quadriceps and achilles. On sensory examination, Dr. Fleming reported that Plaintiff experienced no sensory changes in the cervical or lumbar dermatomes. His motor testing demonstrated normal strength in all muscle groups. Plaintiff demonstrated no evidence of peripheral neuropathies. His major joints, including his hips, showed a normal full and painless range of motion. Dr. Fleming diagnosed Plaintiff with severe degenerative disc disease and multilevel lumbar spondylosis. (*Id*.) Dr. Fleming started Plaintiff on Lyrica and referred him to pain management. Dr. Fleming discussed nonoperative treatment with Plaintiff, noting that if he did not experience any significant improvement, they could consider surgical intervention in the form of a multilevel lumbar decompression and fusion procedure. (R. at 449.)

In a June 2007 follow-up visit, Plaintiff denied leg weakness or gait abnormalities. (R. at 468.) On August 17, 2007, Dr. Fleming reported that an MRI of Plaintiff's lumbar spine dated July 26, 2007, revealed severe degenerative disc disease with multilevel lumbar spondylosis, most notable at L3 to L5. (R. at 466.) On August 29, 2007, Dr. Fleming performed an instrumented posterior spinal fusion, L3 to L5. (R. at 484-502.) A post surgical x-ray of Plaintiff's lumbar spine taken in September 2007 showed evidence of the surgical hardware, but no acute abnormality in Plaintiff's back. (R. at 470.)

In August 2008, Dr. Fleming restricted Plaintiff from work for one year. (R. at 782.) In July 2009, he again restricted Plaintiff from work for one year. (R. at 783.)

**F.      Anthony C. Freeman, D.O./Great Seal Pain Management**

On April 4, 2007, Dr. Freeman examined Plaintiff and diagnosed lumbar radiculitis and multilevel degenerative disc disease. He treated Plaintiff with epidural steroid injections on April 12, 2007, April 30, 2007, and May 15, 2007. (R. at 474, 481-83.) When seen for follow-up in May 2007, Plaintiff reported that the injections did not provide significant relief of symptoms. He continued taking anti-inflammatory, narcotic, and Lyrica medications. (R. at 478-80.)

**G.      O'Bleness Physical Therapy**

Plaintiff underwent physical therapy treatment from March through May 2008. On discharge he reported that his pain level had reduced to five of ten on an analog pain scale. He reported that he felt better and was able to do more activities. He was discharged to a home exercise program after having met all of his goals. (R. at 714-27.)

**H.      Margaret Lionberger, D.O./Holzer Clinic**

Plaintiff sought primary care at the Holzer Clinic on February 19, 2007, with complaints of hypertension, diabetes, hyperlipidemia, and return of a lump in his right breast. (R. at 588-90.) Plaintiff saw Dr. Lionberger and other physicians at the Holzer Clinic through at least September 2009 for treatment of multiple health issues and medication management. (R. at 588-698, 749-56.) On July 23, 2007, Plaintiff's Hgb A1C was 13.4 percent. (R. at 630.) On June 12, 2008, Plaintiff reported to Dr. Lionberger that his sugars had been low recently, but occasionally over 200 post prandial, but that he had not yet began use of an insulin pump. (R. at 733.) A lumbar spine x-ray taken in September 2008 showed mild to moderate degenerative joint disease at every level, as well as hardware from a prior surgery. (R. at 696.)

On December 19, 2008, Plaintiff saw Dr. Lionberger for treatment of a rash. (R. at 697.) On this visit, she noted that Plaintiff was using an insulin pump and that his sugars were controlled. (*Id.*) In May 2009, Dr. Plaintiff reported to Dr. Lionberger that he was following a diabetic diet as well as walking and mowing grass. She noted that his sugar levels were typically under 200 and in the 100s most mornings. (R. at 706.) A physical examination at that time was within normal limits. (R. at 706-09.)

In September 2009, Plaintiff saw Dr. Lionberger for the purpose of filling out disability forms. (R. at 755-56.) Dr. Lionberger noted that Plaintiff had reported to Dr. Fleming that his back pain had improved, but noted that Plaintiff reported it at eight of ten on an analog pain scale. She noted that he had started walking for exercise, but did not walk longer than forty-five minutes. (*Id.*) Dr. Lionberger opined that Plaintiff could not sit or stand for an extended time and that he was unable to bend or lift regularly. She recommended "sedentary/light duty" with an option to change position as needed. (R. at 756.)

I.      **Gary DeMuth, M.D.**

In May 2007, state agency physician Dr. DeMuth reviewed the file and opined that Plaintiff could lift fifty pounds occasionally and twenty-five pounds frequently and sit/walk and stand for about six hours each out of eight. (R. at 415.) Dr. Demuth also found that Plaintiff could frequently perform postural changes except only occasionally climb ladders, ropes, and scaffolds. (R. at 416.) Dr. DeMuth noted that Plaintiff's recent examinations were essentially normal. (*Id.*)

**J.    Judith Brown, M.D.**

On February 11, 2008, Dr. Brown, a consulting physician, examined Plaintiff.  (R. at 511-19.)  Plaintiff complained of lower back pain radiating down both legs to the toes, right shoulder pain, and that his left knee occasionally "pops."  (R. at 511.)  Plaintiff ambulated with short, shuffling steps and carried a cane.  He had difficulty getting into the sitting and supine position.  Dr. Brown's examination of Plaintiff's lumbar spine revealed paraverterbral muscle spasm tenderness and associated tenderness from T6 to the sacrum.  Plaintiff was not able to stand on either leg alone.  Plaintiff's straight leg raising was limited to ten degrees in the supine position on the right leg, and he reported pain in his lower back.  On his left leg, raising was limited to twenty degrees in the supine position, and he reported pain in his lower back.  Plaintiff was unable to walk on his heels or toes and was also unable to squat.  Dr. Brown noted that Plaintiff had significantly decreased range of motion of the right shoulder.  (R. at 512-14.)  She diagnosed Plaintiff with chronic lower back pain, status post multilevel lumbar fusion, right lower extremity pain, and right shoulder pain.  (R. at 514.)  She concluded that his ability to perform work-related activities such as bending, stooping, walking, lifting, crawling, squatting, carrying and traveling, as well as pushing and pulling heavy objects, appeared to be at least moderately impaired by his lower back problems.  (*Id*.)

**K.    Esberdado Villanueva, M.D.**

In March 2008, state agency physician Dr. Villanueva reviewed Plaintiff's file and opined that he could lift twenty pounds occasionally and ten pounds frequently.  He further opined that Plaintiff could stand and/or about six hours in an eight-hour workday and also that he could sit about six hours in an eight-hour workday.  (R. at 521.)  He also opined that Plaintiff

could frequently balance and occasionally climb ramp stairs, stoop, kneel, crouch, and crawl, but that he could never climb ladders, ropes, or scaffolding. (R. at 522.) Dr. Villanueva concluded that Plaintiff was only partially credible. (R. at 525.) He explained that although Plaintiff reported needing a walker to ambulate and the inability to perform most activities of daily living due to pain, Plaintiff was able to ambulate without an aid and did not have muscle weakness. (*Id.*)

## IV.   THE ADMINISTRATIVE DECISION

On January 22, 2010, the ALJ issued her decision. (R. at 17-33.) The ALJ found that Plaintiff had the following severe impairments: hypertension, diabetes mellitus, status post lumbar fusion and status post right mastectomy. (R. at 21.) She further found that Plaintiff was under a closed period of disability from February 12, 2007, through March 31, 2009. (R. at 25-28.) The ALJ concluded that Plaintiff was disabled during this closed period due to his fluctuating sugar levels, which she found prevented him from sustaining routine work tasks on a regular and continuing basis during an eight-hour day, five days a week, for a forty-hour week, or equivalent work schedule. (R. at 25.)

The ALJ determined that medical improvement occurred as of April 1, 2009, such that Plaintiff's disability ended. (R. at 28.) She found that beginning on April 1, 2009, Plaintiff does not have an impairment or combination of impairments that met or medically equaled one of listed impairments. (*Id.*) She concluded that, as of April 1, 2009, Plaintiff has the residual functional capacity ("RFC") to perform the full range of light work. (R. at 29.) Considering this RFC, she found that Plaintiff is capable of performing a significant number of jobs in the

national economy even though he has been unable to perform his past relevant work.  (R. at 32-33.)

## V.    STANDARD OF REVIEW

When reviewing a case under the Social Security Act, the Court "must affirm the Commissioner's decision if it 'is supported by substantial evidence and was made pursuant to proper legal standards.'"  *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. at 2009) (quoting *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. at 2007)); *see also* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .").  Under this standard, "substantial evidence is defined as 'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Rogers*, 486 F.3d at 241 (quoting *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Although the substantial evidence standard is deferential, it is not trivial.  The Court must "'take into account whatever in the record fairly detracts from [the] weight'" of the Commissioner's decision.  *TNS, Inc. v. NLRB*, 296 F.3d 384, 395 (6th Cir. 2002) (quoting *Univ. Camera Corp. v. NLRB*, 340 U.S. 474, 487 (1951)).  Nevertheless, "if substantial evidence supports the ALJ's decision, this Court defers to that finding 'even if there is substantial evidence in the record that would have supported an opposite conclusion.'"  *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).  Finally, even if the ALJ's decision meets the substantial evidence standard, "'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and

where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2007)).

## VI. ANALYSIS

In his Statement of Errors, Plaintiff asserts the following: (1) the ALJ's decision that Plaintiff reached medical improvement, ending the closed period of disability, was in error because it was not supported by substantial evidence; and (2) the ALJ's finding that Plaintiff was capable of the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) was in error in that it was not supported by the substantial evidence of record. The undersigned addresses Plaintiff's arguments in turn.

### A. Medical Improvement

Within his Statement of Errors, Plaintiff contends that the ALJ erred in finding medical improvement in April 2009. More specifically, he asserts that the ALJ failed to reference any data or evidence suggesting medical improvement and that substantial evidence does not support such a finding. The undersigned disagrees.

In cases such as this one, in which an ALJ awards a closed period of benefits, an ALJ "must find a medical improvement in the claimant's condition to end his [or her] benefits, a finding that requires 'substantial evidence' of a 'medical improvement' and proof that he [or she] is 'now able to engage in substantial gainful activity.'" *Niemasz v. Barnhart*, 155 F. App'x 836, 840 (6th Cir. 2005) (quoting 42 U.S.C. § 423(f)(1)). Furthermore, the medical improvement must be related to the ability to work. *McNeal v. Comm'r of Soc. Sec.*, No. 3:11–cv–161, 2012 WL 748834, at *8 (S.D. Ohio Mar. 7, 2012). Despite this approach, however, "there is no

presumption of continuing disability." *Kennedy v. Astrue*, 247 F. App'x 761, 764 (6th Cir. 2007)

(citing *Cutlip*, 25 F.3d at 286–87 n. 1).

In 20 C.F.R. §§ 404.1594 and 416.944, the Regulations outline the process for

considering medical improvement and whether a claimant's disability period has ended.  The

United States Court of Appeals for the Sixth Circuit has described medical improvement as

follows:

> The implementing regulations define a medical improvement as "any decrease in the
> medical severity of your impairment(s) which was present at the time of the most
> recent favorable medical decision that you were disabled or continued to be
> disabled." 20 C.F.R. § 404.1594(b)(1).  A determination of medical improvement
> "must be based on changes (improvement) in the symptoms, signs and/or laboratory
> findings associated with your impairment(s)." *Id.*  And a medical improvement is
> related to an individual's ability to work only "if there has been a decrease in the
> severity . . . of the impairment(s) present at the time of the most recent favorable
> medical decision and an increase in your functional capacity to do basic work
> activities . . ." 20 C.F.R. § 404.1594(b)(3).  *See also Nierzwick v. Commissioner of
> Social Security*, 7 Fed. Appx. 358 (6th Cir. 2001).

*Kennedy*, 247 F. App'x at 764–65.  In other terms, medical improvement "is determined by a

comparison of prior and current medical evidence . . . ." 20 C.F.R. §§ 404.1594(c)(1),

416.994(b)(2)(i).  If medical improvement occurs, the ALJ will then conduct a new RFC

assessment and compare that assessment to the prior RFC to determine if the medical

improvement is related to a claimant's ability to work.  *Id.*  "Unless an increase in the current

residual functional capacity is based on changes in the signs, symptoms, or laboratory findings,

any medical improvement that has occurred will not be considered to be related to [the

claimant's] ability to do work."  *Id.*  The Regulations further provide that "[a] decrease in the

severity of an impairment as measured by changes (improvement) in symptoms, signs or

laboratory findings can, if great enough, result in an increase in the functional capacity to do work activities."  20 C.F.R. §§ 404.1594(b)(4)(i), 416.994(b)(iv)(A).

In this case, as set forth above, the ALJ found disability during the closed period "[d]ue to fluctuating sugar levels."  (R. at 25.)  Upon comparing the medical evidence, she concluded that Plaintiff's fluctuating sugar levels had improved as of April 2009.  Plaintiff does not challenge that improvement with respect to his ability to control his sugar levels relates to his ability to work.  Instead, as set forth above, Plaintiff maintains that the ALJ failed to "cite any . . . data or evidence in her determination that medical improvement had occurred" and that her finding of improvement is "not supported by substantial evidence in the record."  (Pl.'s Statement of Errors 3, ECF No. 11.)

Contrary to Plaintiff's assertion, substantial evidence supports the ALJ's finding of medical improvement.  Further, the ALJ supported her decision with specific references to the record, taking great care to compare the evidence from the closed period with the more recent medical evidence.

In her decision, the ALJ first thoroughly described the severity of Plaintiff's fluctuating sugar levels before he began utilizing an insulin pump.  For example, she noted that in 2006, Plaintiff was hospitalized with blood sugar levels running in the 500s.  She pointed out that in 2007, Dr. Shubrook indicated that Plaintiff was at risk for complications arising from his glucose levels.  She also noted that in June 2007, Dr. Freeman reported that an EMG study revealed diabetic neuropathy.  The ALJ also considered Dr. Lionberger's documentation of Plaintiff's fluctuating sugar levels during the closed period.  She noted that Plaintiff was again admitted to

a hospital in April 2008 for uncontrolled hyperglycemia and that on follow-up in June 2008, Plaintiff continued to complain of fluctuating sugar levels. (R. at 30.)

The ALJ contrasted this medical evidence with the more recent records demonstrating that Plaintiff's fluctuating sugar levels had improved. For example, the ALJ considered Dr. Shubrook's notes from December 2008, after Plaintiff began utilizing an insulin pump, in which he reported that Plaintiff was "doing ok" and that "[o]verall he is much better than last year." (R. at 30, 773.) She noted that in December 2008, Plaintiff also reported to the Holzer Clinic that his sugars were controlled with the insulin pump. The ALJ considered that in April 2009, Dr. Shrubrook again reported that Plaintiff was "doing well overall" and that his physical exam was normal with the exception of right lower extremity pain that Dr. Shubrook opined was muscle-related and could be treated with stretching and massage. (R. at 30-31, 770.) She noted that in May 2009, Plaintiff was following a diabetic diet, walking for exercise, mowing the grass, and his physical examination was normal. Finally, the ALJ pointed out that Plaintiff had testified to this improvement himself, representing that before the insulin pump, his sugar levels ran in the 600-700 range contrasted with 200-300 range after the pump. Consistently, in April 2009, Plaintiff reported to Dr. Shubrook that he was doing better.

Because substantial evidence supports the ALJ's finding of medical improvement, the undersigned **RECOMMENDS** that the Court **OVERRULE** Plaintiff's first statement of error.

**B.     Residual Functional Capacity Assessment**

Plaintiff contends that the ALJ erroneously concluded that after April 2009, Plaintiff had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b). In support of his assertion that substantial evidence does not

support the ALJ's finding, Plaintiff relies on his hearing testimony regarding his pain levels, his subjective reports of pain to Drs. Lionberger and Fleming, and Dr. Lionberger's opinion that Plaintiff should be limited to sedentary/light duty, with additional limitations concerning standing, sitting, bending, and lifting. The undersigned concludes that substantial evidence supports the ALJ's RFC assessment.

A plaintiff's RFC "is defined as the most a [plaintiff] can still do despite the physical and mental limitations resulting from [his or] her impairments." *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 155 (6th Cir. 2009); *see also* 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of RFC is an issue reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e), 416.927(e). Nevertheless, substantial evidence must support the Commissioner's RFC finding. *Berry v. Astrue*, No. 1:09CV000411, 2010 WL 3730983, at *8 (S.D. Ohio June 18, 2010).

To assist in RFC determinations, the Commissioner considers physical exertional requirements and "classif[ies] jobs as sedentary, light, medium, heavy, and very heavy." 20 C.F.R. §§ 404.167, 416.967. The regulations provide the following description of light work:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities.

20 C.F.R. §§ 404.167(b), 416.967(b) (emphasis added). With regard to standing and walking requirements, "[b]y rule . . . the full range of light work requires standing and/or walking for approximately six hours of an eight-hour workday." *Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009) (citing SSR 83-10p, 1983 WL 31251, at *6 (1983)).

The undersigned concludes that the evidence the ALJ referenced and relied upon in formulating Plaintiff's RFC constitutes substantial evidence supporting her determination.[3] Specifically, the ALJ considered that Dr. DeMuth found that Plaintiff could perform a full range of medium work (R. at 31–32, 415–21); Dr. Villanueva recommended restrictions consistent with a light range of work (R. at 32, 521–27); and Dr. Brown found moderate work-related limitations (R. at 32, 514). Notably, these opinions, which all are consistent with the ALJ's RFC determination, predate Plaintiff's successful physical therapy and 2008 and Dr. Shubrook's subsequent physical examinations with normal findings. (*See* R. at 714–27 (discharging Plaintiff from physical therapy to a home exercise program, indicating that he rated his pain at 5/10, "feels better," is "able to do more activities," and met all of his goals).) The ALJ also credited Dr. Lionberger's opinion to the extent she concluded that Plaintiff was limited to the light level exertion, rejecting any restrictions beyond this as inconsistent with the record. (R. at 32, 756.)

Moreover, the ALJ did not err in her assessment of Plaintiff's credibility with regard to his subjective complaints of pain. "The ALJ's assessment of credibility is entitled to great weight and deference, since he had the opportunity to observe the witness's demeanor." *Infantado v. Astrue*, 263 F. App'x 469, 475 (6th Cir. 2008) (citing *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531); *Sullenger v. Comm'r of Soc. Sec.*, 255 F. App'x 988, 995 (6th Cir. 2007) (declining to disturb the ALJ's credibility determination, stating that: "[w]e will not try the

---

[3]This does not mean that the ALJ could not have reached a different conclusion from this evidence. *See Blakely*, 581 F.3d at 406 ("[I]f substantial evidence supports that ALJ's decision, this Court defers to that finding even if there is substantial evidence in the record that would have supported an opposite conclusion.") (internal quotation marks and citation omitted).

case anew, resolve conflicts in the evidence, or decide questions of credibility" (citation omitted)).

This deference extends to an ALJ's credibility determinations "with respect to [a claimant's] subjective complaints of pain." *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 652 (6th Cir. 2009) (quoting *Siterlet v. Sec'y of Health & Hum. Servs.*, 823 F.2d 918, 920 (6th Cir. 1987)). In *Duncan v. Secretary of Health and Human Services*, 801 F.2d 847, 853 (6th Cir. 1986), the Sixth Circuit established the following test for evaluating complaints of disabling pain. First, the court must determine "whether there is objective medical evidence of an underlying medical condition." If so, the court must then

> examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Duncan*, 801 F.2d at 853.

Despite this deference, "an ALJ's assessment of a claimant's credibility must be supported by substantial evidence." *Walters*, 127 F.3d at 531. The ALJ's decision on credibility must be "based on a consideration of the entire record." *Rogers*, 486 F.3d at 247 (internal quotation omitted). "Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among the medical reports, claimant's testimony, and other evidence." *Walters*, 127 F.3d at 531. Furthermore, in assessing credibility, the ALJ may consider a variety of factors including "the location, duration, frequency, and intensity of the symptoms; . . . [and] the type, dosage, effectiveness, and side effects of any medication taken to alleviate the symptoms . . ." *Rogers*, 486 F.3d at 247.

Here, after considering the evidence, the ALJ found that Plaintiff's medically determinable impairments could reasonably be expected to produce the alleged symptoms but that his statements concerning the intensity, persistence, and limiting effects of these symptoms were not credible after the closed period to the extent they contradicted her RFC determination. (R. at 30.) In support of this finding, the ALJ pointed out the that objective medical findings and Plaintiff's treatment history did not support his testimony. Specifically, she pointed out that Plaintiff had reported to Dr. Shubrook that he was doing "ok" in December 2008. (*Id*.) She also noted that in April 2009, Plaintiff reported that he was doing well overall and that he walked for exercise. She further noted that Dr. Shubrook's April 2009 physical exam was normal with the exception of Plaintiff's complaints of right lower extremity pain and that Dr. Shurbrook indicated that this pain was likely muscle-related and should be treated with stretching and massage. (R. at 30–31.) She pointed out that Plaintiff's physical exam in May 2009 was also normal and that Plaintiff reported that he was walking and mowing grass for exercise. (*Id*.) Finally, the ALJ reasonably found that Plaintiff's failure to seek medical treatment for more than a year for his back, even though he had access to medical care, undermined his testimony of disabling pain.

In sum, because the undersigned concludes that substantial evidence supports the ALJ's RFC determination, it is **RECOMMENDED** that the Court **OVERRULE** Plaintiff's second statement of error.

## VII. CONCLUSION

From a review of the record as a whole, the undersigned concludes that there is substantial evidence supporting the ALJ's decision finding a closed period of disability.

Accordingly, the undersigned **RECOMMENDS** that the Court **OVERRULE** Plaintiff's

Statement of Errors and **AFFIRM** the Commissioner of Social Security's decision.

## VIII. PROCEDURE ON OBJECTIONS

If any party seeks review by the District Judge of this Report and Recommendation, that

party may, within fourteen (14) days, file and serve on all parties objections to the Report and

Recommendation, specifically designating this Report and Recommendation, and the part in

question, as well as the basis for objection. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).

Response to objections must be filed within fourteen (14) days after being served with a copy.

Fed. R. Civ. P. 72(b).

The parties are specifically advised that the failure to object to the Report and

Recommendation will result in a waiver of the right to *de novo* review by the District Judge and

waiver of the right to appeal the judgment of the District Court. *See, e.g.*, *Pfahler v. Nat'l Latex

Prod. Co.*, 517 F.3d 816, 829 (6th Cir. 2007) (holding that "failure to object to the magistrate

judge's recommendations constituted a waiver of [the defendant's] ability to appeal the district

court's ruling"); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005) (holding that

defendant waived appeal of district court's denial of pretrial motion by failing to timely object to

magistrate judge's report and recommendation). Even when timely objections are filed,

appellate

review of issues not raised in those objections is waived. *Robert v. Tesson*, 507 F.3d 981, 994

(6th Cir. 2007) ("[A] general objection to a magistrate judge's report, which fails to specify the

issues of contention, does not suffice to preserve an issue for appeal . . . .") (citation omitted)).

Date:  August 16, 2012                              /s/ *Elizabeth A. Preston Deavers*
                                                    Elizabeth A. Preston Deavers
                                                    United States Magistrate Judge